**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA

v.                                     Criminal Action No. 3:21cr137

COREY EUGENE YOUNG,

     Defendant.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION TO SUPPRESS AND INCORPORATED MEMORANDUM OF LAW (ECF No. 15) ("the Motion").  The Motion was briefed and an evidentiary hearing was held, after which the parties submitted additional briefing and an argument was heard.

Corey Eugene Young moves to suppress the firearm and drugs found by Richmond Police in a car that Young was driving.  Having reviewed body-worn camera footage of the events leading up to the search of the car, witness testimony from the evidentiary hearing, and the parties' briefing and oral argument, the Court finds that there was probable cause to search the car in question and that the search was therefore reasonable within the meaning of the Fourth Amendment.

### BACKGROUND

In the early morning hours of May 20, 2021, Detective Jessica Spence, an agent in the Richmond Police Department's Special

Investigations Division, received a tip from a confidential source

("CS").  In a text message, the CS told Spence:

> I got in touch with a guy named Corey Young. Plenty of guns
> and drugs. He be with Rodney Staples and associated with
> Sticks. Corey is part of the 004 Gang.  Always have plenty of
> drugs and a gun on his waist and an AR and another hand pistol
> in the car.

Tr., ECF No. 23 at 13-14.  Spence knew "Sticks" to be the street

name of Naquan Wright, a drug distributor whom she had previously

arrested.  Id. at 15.

The CS who relayed this information to Spence had worked with

the Richmond Police Department since 2014 and had "provid[ed]

information  on  various  violent  offenses  through  aggravated

assaults and homicides, as well as narcotics cases and gun cases."

Id. at 16.  Spence viewed the CS as a reliable informant given his

track record.  After receiving the tip, Spence researched Young in

the Police Department's records system and found that there were

three "alerts" for Young's name:  one for being a narcotics user

and  seller,  one  for  being  gang-affiliated,  and  one  for  being

"probably armed."  Id. at 17.  Further review of documentation of

contacts the Police Department had had with Young indicated to

Spence that Young had a history of "violent offenses," "narcotic

violations" (as a seller), and "gang activity."  Id.  Thus, those

records confirmed the information provided by the CS about Young

in the text he sent to Spence.

2

The CS then also provided Spence with a Facebook account under the name "Uptown Legends," which she was able to verify was Young's account by comparing the account's profile picture with the Department's own records. Id. at 18. In further communications, the CS told Spence that Young regularly "trap[ped]" (i.e., dealt drugs) at the Belt Atlantic apartment complex and would be doing so later that day. Id. at 19-20.

The CS had a contractual arrangement with the Richmond Police Department whereby he would be paid in exchange for providing certain kinds of information and adhering to certain protocols and guidelines. Id. at 77-79. Over the course of Spence's text message exchanges with the CS the morning of the 20th, he mentioned on three separate occasions that he needed to be paid that same day and hoped that informing on Young could be a means to that end. Id. at 80.

Later that morning, the CS told Spence that Young would be driving a black truck or a black Tahoe or Suburban. Id. at 63. That information was later revised, with the CS stating that he had seen Young in-person in a gray Kia sedan, id. at 71, and had seen a firearm and drugs in the car. Id. at 20. The CS gave Spence the license plate number and told her that the car had Colorado tags. Id. at 71. That conversation occurred "[l]ess than 30 minutes" before Young's detention. Id. at 22.

3

Sergeant Frias, another officer in the Richmond Police Department's Special Investigations Division, went to the apartment complex to carry out undercover surveillance. Frias had eleven years' experience in the Richmond Police Department. Id. at 81. He had spent seven years assigned to a precinct that included the Belt Atlantic apartment complex where Young was arrested. Id. at 82. He knew from that experience that it was "a high crime area" with frequent "shootings, drug activity, random gunfire." Id.

Frias located the gray Kia and confirmed that it bore the specified Colorado license plate. Young was in the Kia. Frias surveilled Young's activities from an unmarked car parked somewhere between 20 and 40 feet away from Young's movements, observing mostly through his rearview mirror. Id. at 90, 106-107. While surveilling, Frias witnessed the following sequence of events: A Lincoln pulled into the parking lot near Young's Kia. Young went to the Lincoln and got in the front passenger seat. Young then got out of the Lincoln and returned to his car. A man then walked out from a different part of the apartment complex to the parking lot. The driver of the Lincoln got out of his car and walked with that man to a nearby breezeway before returning.

Based on his previous experience, Frias concluded that this sequence was "consistent of a . . . middle deal," id. at 92, in which a drug dealer uses a middleman to make the hand-to-hand drug

4

exchanges with a purchaser.  Frias took as further evidence that drug dealings were underway the fact that the driver of the Lincoln "had his hands in his pocket," which Frias believed was "consistent with drug transactions."  Id. at 93.

Frias then also observed that, after the driver of the Lincoln returned to the breezeway and got back in the Lincoln, Young approached the Lincoln with a "balleded [sic] fist" and "[held] it [i.e., the fist] inside the gray Lincoln."  Id. at 94.  Frias believed this to be indicative of a model of drug transaction in which the middleman, as a reward for being the go-between for the drug purchaser and the drug dealer, receives a reward of either drugs or money from the dealer after the exchange is complete. Id.

Because there was an active warrant for Rodney Staples' arrest, the officers involved wanted to be able to detain Staples and Young at the same time.  Consequently, when Frias observed that Staples had left the apartment complex, the police officers waited to move in until Staples had returned.  After Staples returned to the parking lot, Frias had seen Young approach Staples' car--which was parked nearby--and interact with Staples.  Id. at 35.

After Frias reported seeing Young approach Staples' car upon Staples' return, Spence made the decision to move in to arrest Staples and to detain Young.  Id.  Immediately after arresting

5

Staples, the officers on the scene found suspected heroin and crack cocaine in Staples' SUV. Id. at 36. Young was detained while holding a key fob for the Kia sedan that Frias had observed him sitting in and which matched the description of the car the CS had told Spence that Young was using that day. Id. at 40.

While Staples' car was being searched, a K-9 unit named Gaja arrived and was "run" on Young's person, alerting at his leg. Id. at 48-49.[1] The alert was by sitting after smelling Young's leg. Young was then patted down, which revealed that he was carrying approximately $1700 in currency but no weapon and no drugs. Id. at 49. Gaja was then run on Young's car. Young disputes whether Gaja alerted on his car in any meaningful way, while Officer Sovine, Gaja's handler, claims that Gaja alerted at the seam of the rear passenger-side door and underneath the trunk.

Footage from Officer Sovine's body-worn camera shows Gaja acting erratically while being led around the Kia sedan. Gaja repeatedly lunges back toward Young, runs in circles around Sovine, and jumps on adjacent cars. Though Sovine testified that Gaja's behavior was sufficiently focused for Sovine to determine that Gaja had alerted at two places, that determination stands in contrast to Gaja's failure ever to sit at a spot along the car the

---

[1] Though Young argues that Gaja did not properly alert on the Kia sedan, he conceded at the second suppression hearing that Gaja did properly alert on his leg. The body-worn camera footage confirms that to have been the case.

way she sat when alerting on Young's leg and in contrast to Sovine's comment recorded at the end of the footage that she "can't get [Gaja] to focus."

Sovine told her colleagues that Gaja had alerted on the Kia. A search of the sedan revealed suspected crack cocaine and heroin as well as a firearm and ammunition.  Id. at 56-58.  Young was arrested and is now awaiting trial. He moves to suppress the evidence from the Kia sedan, arguing that the government lacked probable cause.

**LEGAL STANDARD**

**Probable Cause**

Young challenges the legality of the search only with respect to whether the police had probable cause to believe that the car contained contraband related to drug dealing.  The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their . . . effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.   "In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution." Chambers v. Maroney, 399 U.S. 42, 51 (1970).  Under the automobile exception, police may search a vehicle without a search warrant so long as they have probable cause to believe that it contains contraband or evidence of a crime.  Id.

The standard for probable cause is "flexible" and "common sense." Florida v. Harris, 568 U.S. 237, 240 (2013). A court is to ask whether "the facts available to [a police officer] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." Id. at 243 (internal citations and quotations omitted). This test does not turn on the evidence's reaching some determinate and quantifiable threshold of probability; it does not even necessarily require that the probability of criminal wrongdoing is greater than not. See Illinois v. Gates, 462 U.S. 213, 235 (1983). Probable cause can result from the agglomeration of facts that, individually, are seemingly innocent or ambiguous. See District of Columbia v. Wesby, 538 U.S. ____, ____, 138 S. Ct. 577, 588 (2018). This means that a court must recognize "that the whole is often greater than the sum of its parts--especially when the parts are viewed in isolation." Id. Therefore, courts are cautioned against employing a "divide-and-conquer analysis" that picks at the plausibility of each individual piece of evidence rather than considering the whole. Id. (quoting United States v. Arvizu, 534 U.S. 266, 267 (2002)). The "substance" of any definition of probable cause is that there be "reasonable grounds" for the officer to believe the suspect to be guilty of a crime when considering all of the information available. Maryland v. Pringle, 540 U.S. 366, 371 (2003). In assessing whether the record in a case establishes

8

probable cause, courts are to give proper credit to the reasonable experiences and observations of trained police officers.  Ornelas v. United States, 517 U.S. 690, 699 (1996) ("[A] police officer views the facts through the lens of his police experience and expertise.  The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference.").

As the probable cause standard is applied to tips from informants, the Supreme Court has stated that partial verification of an informant's detailed tip, even as to non-criminal facts about a suspect, may create probable cause to believe that a suspect is engaged in wrongdoing.  See Draper v. United States, 358 U.S. 307 (1959).  As the standard applies to canine sniffs, the Supreme Court stated that

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

Harris, 568 U.S. at 246-47.  And as the standard applies to officers' own observations, the Supreme Court has stated:

> [P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts. As we have explained, the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts. Thus, the panel majority should have asked whether a reasonable officer could conclude—considering all of the

9

> surrounding circumstances, including the plausibility of the
> explanation itself—that there was a substantial chance of
> criminal activity.

Wesby, 538 U.S. at ____, 138 S. Ct. at 588.

**Suppression**

The Supreme Court of the United States has made clear that suppression is a remedy of "last resort, not our first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006). That is because the costs of applying the rule create a "high obstacle" for its application. Id. (quoting Pennsylvania Bd. Of Probation & Parole v. Scott, 524 U.S. 357, 364-65 (1998)). Consequently, the rule for applying the remedy of suppression is that it is to be applied "where its deterrence benefits outweigh its 'substantial social costs.'" Scott, 524 U.S. at 363 (quoting United States v. Leon, 468 U.S. 897, 907 (1983)). Thus, in addition to demonstrating a Fourth Amendment violation that was a but-for cause of law enforcement's obtaining the evidence at issue, a defendant moving for suppression of evidence must also show why the remedy of suppression is merited given the facts of the case and the probability that suppressing the evidence in question would be reasonably likely to deter the kind of conduct in question.

## ANALYSIS

### Probable Cause

The government does not claim that it had probable cause solely on the basis of any one piece of evidence. Determining

whether there was probable cause to search the vehicle thus requires the Court to determine whether, taken as a whole, the aggregate body of evidence provided "reasonable grounds" to think weapons and drug contraband would be found in the car.

## 1.   It Was a High-Crime Area

The government attorney--and the officers who testified at the first hearing--emphasized repeatedly that the events took place at an apartment complex known to be a high crime area known for frequent drug dealing.  This factor alone does not amount to very much in making an individualized determination of probable cause but the Supreme Court has stated that "the fact that the stop occurred in a 'high crime area' [is included] among the relevant contextual considerations in a Terry analysis." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).  Though a probable cause determination is different than a Terry analysis, the fact that the events took place in a high-crime area, known for drug-dealing activity, lends some additional force to the government's claim of probable cause.  See United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004) ("In assessing the totality of the circumstances [in a probable cause analysis], it is appropriate to consider . . . the context of a high-crime area . . . .").

## 2.   The Confidential Source's (CS) Tip

This law enforcement action did not commence until Detective Spence received a tip from a confidential source stating:

> I got in touch with a guy named Corey Young. Plenty of guns and drugs. He be with Rodney Staples and associated with Sticks. Corey is part of the 004 Gang. Always have plenty of drugs and a gun on his waist and an AR and another hand pistol in the car.

Tr., ECF No. 23 at 14. Spence knew "Sticks" to be a drug distributor, and a warrant had already been issued for Staples' arrest. Spence further stated that work with this CS had led to "at least ten" prosecutions, though Spence did not know how many of the prosecutions had resulted in actual convictions. Spence was able both to verify in law enforcement records that Young was believed to be involved in drug-related activity and to obtain from the CS social media information that confirmed the CS's knowledge of Young's identity.

The CS then told Spence what Staples and Young would be wearing and what kind of car Young would be driving. Though the CS initially told Spence that Young would be in a black car, the CS later revised that description, upon making visual contact, to state that Young was in a gray Kia sedan with Colorado tags, which was in fact what Young drove that day into the area where the CS said he would be. Finally, the CS told Spence that Young regularly "traps" (i.e., deals drugs) at the Atlantic Belt apartment complex. ECF No. 23 at 19-20.

Frias's surveillance confirmed that Young and Staples were at the apartment complex, as the CS said that they would be. Frias further confirmed the CS's descriptions of what they would be

12

wearing and the CS's revised description of the car that Young would be driving.   As discussed below, Frias's surveillance provided information "consistent with" drug dealing but did not actually substantively confirm that Young was dealing drugs from his car.   When law enforcement detained Young, they performed a preliminary patdown.   That patdown revealed that Young was carrying approximately $1700 on his person but did not reveal any weapons.

The government's analysis emphasizes that the CS was well-known to the department and had worked productively with local law enforcement since 2014.   The government further emphasizes the various forms of information provided by the CS that were verified, including Young's clothing, his social media account, and whereabouts that day, as well as (eventually) the car that he was driving.   The CS had also correctly informed Spence that Young would be associating with Rodney Staples, a known criminal with an active warrant.

Young's analysis emphasizes two ways in which the CS's information proved to be imperfect.   First, the CS initially misidentified the car that Young would be driving.   Next, the CS stated that Young would be carrying a gun on his belt; that proved to be untrue, as the officers on the scene learned when they performed their initial patdown of Young after detaining him.

Young's counsel also emphasized at the evidentiary hearing that the CS mentioned "on at least three occasions . . . needing

13

money and wanting to get paid . . . that day[.]" Tr., ECF No. 23 at 80. But by the time the Kia sedan was searched, the police had confirmed nearly every part of the information that an informant (who was, historically, reliable) had given them. While the source's expressed desire for a quick payout certainly provided the Police with reason to proceed with caution, confirmation of multiple highly-specific pieces of information obtained from the CS reasonably allayed worries about his reliability. The Police were then left with the information that a reliable CS had claimed to have seen drugs and a gun in Young's possession in the car.

As the government noted in its first round of briefing on the suppression issue, case law holds that "[c]orroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct." United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir. 1993). As applied here, the fact that the police had confirmed many specific claims of direct observation by the CS (Young's car, his clothing, the presence of Staples) gave the police reason to credit the CS's claim to have seen drugs in Young's possession. While those claims did not, in themselves, provide the Police with probable cause, a reasonable officer was nevertheless entitled to regard the CS's tips as highly probative and reliable.

14

### 3.   Frias's Surveillance

Young makes several rather strained objections to evidence from Frias's surveillance.  For example, Young argues that Frias "is repeatedly switching back and forth between looking at activities through the rearview mirror and turning completely around to see what he can see." ECF No. 25 at 9.  Young further argues that, because Frias lost visual contact with what was going on while alternating between looking through his mirror and looking out the window, some observations might have been "missed as the switch [was] made." Id.   That argument is unpersuasive.  It is not too much to suppose that a police officer with eleven years' experience would be able to monitor a situation through his rearview mirror and would be able to turn in his seat quickly enough to shift his gaze from his mirror to his window without missing substantial portions of ongoing activity.

In cross-examination, Young's attorney elicited the more substantive point that Frias was "look[ing] around either parked cars or maybe even tree limbs at some point" in carrying out his observations. Tr., ECF No. 23 at 108.  While that fact might cast some doubt on Frias's reports had he claimed to observe very subtle details, his reports are mostly about the comings and going of various individuals between various cars.  What is more, Frias was not reporting things he happened to observe while otherwise

15

occupied--it may be presumed that the entirety of his attention was directed at making the observations to which he testified.

Young further objects that Frias's theory of what he was seeing is "illogical." Frias watched Young exit his Kia and get in a Lincoln. He then saw Young leave the Lincoln to return to the Kia and saw the driver of the Lincoln leave to walk to a breezeway with another individual. Frias then described seeing Young return to the Lincoln, reaching into the window. Id. at 94. Frias, based on experience, concluded that this was an exchange whereby the middleman, the Lincoln driver, was first given drugs to pass off to the person in the breezeway, after which he was then himself compensated with drugs given to him by Young. There was an additional interaction between Young and individuals in a white Kia sedan. Id. at 103-04.

There is, quite simply, nothing illogical about Frias's theory of a middleman drug runner, and the government points to case law where such an arrangement for drug transactions is contemplated. See, e.g., United States v. Guess, 736 F. Supp. 2d 730, 734 (E.D.V.A. 2010). It is perfectly coherent and reasonable for a drug dealer to wish to interpose a third party between himself and the end user, among other reasons because, as is alleged here, interposing a middleman makes it more difficult for police to prove what is happening.

At the same time, Frias's observations provide only a modest degree of confirmation for the theory that Young was dealing drugs that day.  Frias observed "balled fists," for example, and claimed that that, and the other activity that he saw that afternoon, was "consistent with" drug transactions.  That description, by itself, reflects a low degree of probative value.  But, in combination with the other evidence the police had gathered to that point, it fills out detail in the picture already sketched by other pieces of information that the Police were able to obtain.  As Frias admitted at the evidentiary hearing, however, he never saw money or items transfer hands and only saw two suspected drug deals in total.  Tr., ECF No. 23 at 109-10.

**4.   The Canine Sniff**

At the evidentiary hearing, the Court heard testimony from Officer Sovine, the handler for the K-9 unit Gaja.  Sovine testified that she had worked with Gaja since November 2020.  Sovine testified that, as a handler's relationship with a K-9 unit develops, the officer learns "[to] watch how the dog changes" in response to detecting the odor of narcotics.  Id. at 119.  Sovine further testified that Gaja's indicators are that "she starts to breathe in a lot quicker" and that, while "her tail wags fast pretty much most of the time," when she detects an odor "[the tail wag] becomes significantly faster than just normal tail wag."  Id. Additionally, Gaja will "become focused on that one specific area"

17

and "tends to stay in that area to try and get as close to the odor as possible." Id. at 120.

As to Gaja's temperament, Sovine testified that she is "a very hyper dog  but also very focused," and that she "wants to do as much as she can and she's all over the place a lot of times, but just still a very hardworking dog." Id. at 126.

### a. The First Alert

The government's brief emphasizes that Gaja appeared focused and well-behaved when alerting on Young's leg. Even Young concedes that Gaja's alert on his leg was by all appearances a normal, valid alert. Though the Police did not find any drugs on Young's person in their patdown search, the alert made some marginal contribution to the probable cause analysis:  though there are innocent explanations for why a dog might have alerted on Young's pant leg, the alert is most probative of the proposition that Young had at some point recently been in the vicinity of drugs. And that proposition is itself probative of the truth of the CS's claim that Young had drugs in his possession in the Kia sedan.

### b. The Second Alert

The erratic behavior captured in the body-worn camera footage is attributed to Gaja's general excitability and desire to return to Young after having alerted on him. (Thus Sovine's statement, in the body camera footage, "I can't get her to focus because she's fixated on him.") The government further emphasizes that Gaja did

18

eventually seem to give particular attention to the seams of the rear passenger-side door and under the trunk--both places where Sovine suggested there might have been greater air leakage from the car.   The government also leans on Sovine's claim that Gaja may alert simply with changes in breathing--an indication not readily discernible in the camera footage viewed at the first suppression hearing but, according to Sovine, discernible to an experienced handler familiar with the dog's mannerisms.

In reviewing the body-worn camera footage of Gaja's being run on Young's car, Sovine stated that Gaja "show[ed] a lot of attention on the seam of the door," which Sovine noted as a "one of the changes in behavior."   Id. at 135.   The other change of behavior Sovine testified to noticing was when Gaja was "pulling underneath the trunk," which Sovine described as being an indicator that the odor of narcotics was "dropping" down from the car.   Id. Sovine testified that that change in behavior was "sufficient in [her] mind" to consider Gaja to have alerted on the trunk.

Young, in turn, relies on the Supreme Court's explanation that assessing a canine sniff in a probable cause analysis requires an analysis of the totality of the factors:

> The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

Florida v. Harris, 568 U.S. 237, 248 (2013). That means that "even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause." Id. at 247. Even where a dog is fully certified, a court's presumption that an alert provides probable cause is "subject to any conflicting evidence offered." Id. at 246-47. Here, Young is right that there are significant reasons to be doubtful that Gaja was generating reliable information given her highly erratic and uncontrolled behavior while being run on the sedan.

Most significantly, Sovine herself says in the body-worn camera footage that she could not get Gaja to focus on the car because she was distracted by wanting to go back to Young. That assertion seems well-substantiated by Sovine's having repeatedly to tug Gaja back to Young's car as Gaja lunged toward the adjacent car and toward Young. What is more, though Sovine testified that Gaja's crawling under the trunk of the car constituted a "hit" on that spot, ECF No. 23 at 145, in the video Sovine merely jerks Gaja's leash to pull her out from under the car and turns to the nearby officer to state that she cannot get Gaja to focus--after which she ends the search. That stands in contrast to Sovine's behavior when Gaja more clearly hit (and sat) on Young's shoe. It also stands in contrast to Sovine's statement that other officers can identify when Gaja has hit on an odor because "[Sovine] praise[s] her up like that [i.e., as she did for the hit on Young's

20

leg]." Id. at 134.  Sovine does not appear to give Gaja praise in for a hit on the car, nor does she appear to give any other indication in the video that she regards Gaja as having hit on the car.  In her testimony, she states that Gaja's digging under the trunk of the car was treated as a hit, but in the video Sovine appears to be attempting to redirect Gaja's attention to the seam of the trunk while Gaja is under the car.  That behavior is in tension with the claim that Gaja's crawling under the car was indicative of a hit.

Finally, Sovine testified that, when Gaja smells something, she "tends to stay in that area to try and get as close to the odor as possible."  Tr., ECF No. 23 at 120.  But none of Gaja's behavior while being led around the car clearly corresponds to that description of how Gaja behaves when alerting.

\*     \*     \*

It is a delicate matter for a court to second-guess the opinion of an expert on some issue within their domain of expertise.  But an expert is not insulated from scrutiny in virtue of their expertise, particularly when their opinion can be measured against their own testimony as to their methods and practices.

Here, without calling into doubt Officer Sovine's skill as a K-9 handler, or her credibility generally, several observations constrain the Court to conclude that Gaja cannot be treated as having validly alerted on the Kia sedan.  First, Gaja's behavior

when alerting on Young's leg was dramatically different than Gaja's behavior when being run on the car. Second, while Sovine treated Gaja as having alerted on Young's leg by enthusiastically praising her (which she described in her testimony as itself being part of the dog's training), she exhibited no such reaction to Gaja's behavior when being run on the car. Third, Sovine's various descriptions of behaviors that correspond to an alert do not clearly match anything visible in the video. Gaja does not sit and does not focus on any one place on the car, except perhaps when digging under the trunk. But that action seems in the video to Sovine's tugging Gaja away and attempting to redirect her to the seam of the trunk. Fourth, Sovine's own statement in the video that she could not get Gaja to focus on the car is reason in itself to doubt the probative value of Gaja's behavior. Finally, while the Court cannot interpose its own judgment of dog behaviors in place of a trained expert's, there is the residual fact that Gaja's behavior in the body-worn camera footage is to all appearances uncontrolled. She repeatedly spins Sovine in circles; she lunges on other cars and at Young; she noses at trash. The only descriptions of Sovine's of Gaja's behavior when alerting that do not seem contradicted by the video evidence are the claims that her breathing and tail-wagging both quicken. Those behaviors are, in practice if not in principle, not verifiable. The Court cannot find it reasonable to view Gaja's behavior when being run on the

22

sedan as constituting a proper alert when every verifiable indicator suggests that she was so unfocused and erratic that she was unable to perform her proper function.

To conclude otherwise would prove far too much. At the second hearing on the Motion, the government argued for a standard that would essentially insulate a K-9 handler's judgment from judicial oversight when the K-9 unit in question was properly certified. But scientific rigor requires precommitment to standards by which a practice may be measured.[2] Here, Gaja exhibited virtually none of the behaviors that Sovine testified to be indicative of an alert. And the Court simply cannot hold that unconditional deference must be given to a K-9 handler's judgment, even in the face of a mountain of contravening evidence that calls into doubt the reliability of a particular canine alert. The Court therefore finds that for the purposes of the probable cause analysis here, Gaja can be treated as having alerted on Young's leg but not on the Kia sedan.

## 5.    Conclusion

In sum, without the evidence of a canine alert on the car, this is a close case for probable cause. But the information that the Police gathered that day, in aggregate, was sufficient for a

---

[2] See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999).

23

reasonable officer to conclude that it was likely that drugs and a firearm would be found in the sedan.

Frias's observations found that Young was doing something "consistent with" drug activity.  That partially corroborated the CS's tip, as did Staples' presence and the drugs that were found in Staples' car before the search of Young's car.  Finally, Gaja's alert on Young's leg made it still more probable that Young had recently been handling drugs, and that provided the Police with even greater justification to believe there to be drugs in the car.  Additionally, the government said little about the evidence gathered from Staples.  But Staples was found to be in possession of narcotics and a firearm, and Young had been seen interacting with Staples.  Those facts supported the already partially-confirmed claims made by the CS.  All of those facts, taken together, cross the threshold of creating probable cause.

**Suppression**

As explained above, Courts are to resolve suppression issues by means of a balancing test:  given the costs of suppressing evidence of criminal wrongdoing, courts are to suppress only where the benefits of deterring state actors from violative conduct outweighs "the price paid by the justice system."  Herring v. United States, 555 U.S. 135, 140 (2009).

Even if the Court were to find there not have been probable cause, Young did not carry the burden of explaining why suppression

24

is merited here under the balancing test described by the Supreme
Court.

Young's attorney speculated at oral argument that suppression
here might cause K-9 handlers to be more cautious as to when they
declare a dog to have alerted on a vehicle.  But K-9 handlers are
already amply motivated to ensure that they report only valid
alerts.  Doing otherwise would waste Police time and labor on
fruitless searches and would over time create a body of evidence
that would call into question a K-9 unit's serviceability.  Thus,
even if Young's probable cause argument were to succeed, he would
not have carried the burden of showing that suppression would be
an appropriate remedy here.

**CONCLUSION**

For the reasons described above, the Motion is denied.


_____   /s/        REP
                    Robert E. Payne
                    Senior United States District Judge
Richmond, Virginia
Date:  April  20, 2022